# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

Herbert Dewayne Wesley,

     Petitioner

v.

Brian Williams,[1] et al.,

     Respondents

Case No. 2:20-cv-00783-JAD-BNW

**Order Denying Petition for Habeas Relief and Closing Case**

[ECF No. 25]

Petitioner Herbert Dewayne Wesley brings this counseled second-amended habeas corpus petition under 28 U.S.C. § 2254 to challenge his 1995 Nevada state-court conviction for robbery with the use of a deadly weapon and two counts of first-degree murder with the use of a deadly weapon after a jury trial.[2]  Currently sentenced to three life sentences without the possibility of parole,[3] Wesley in his second-amended petition alleges that his trial counsel failed to move to recuse the trial judge and investigate his case, the trial court failed to recuse one of the prosecutors and gave an invalid jury instruction, and the prosecutor improperly argued reasonable doubt during closing argument.[4]  Having evaluated the merits of those claims, I find that habeas relief is not warranted, so I deny the petition, deny Wesley a certificate of appealability, and close this case.

---

[1] The state corrections department's inmate-locator page states that Wesley is incarcerated at High Desert State Prison.  Brian Williams is the warden for that facility.  At the end of this order, I direct the clerk to substitute Brian Williams as a respondent for Respondent Jerry Howell under Federal Rule of Civil Procedure 25(d).

[2] ECF No. 18-1.

[3] ECF No. 18-7.

[4] ECF No. 25.

# Background

**A.  The facts underlying Wesley's convictions[5]**

On March 10, 1992, law enforcement officers responded to a report of a double homicide at a house in Las Vegas, Nevada.  Wesley's father, Isaac Wesley, was found dead in the dining room area of the home, and Wesley's stepmother, Doella Wesley, was found dead in a bedroom. A knife was found next to Isaac's body with a bloody fingerprint on the handle, and a television set was missing from the living room.  A latent print examiner testified that the print from the handle of the knife was a match to Wesley's left index finger.  Dr. Robert Jordan, who performed the autopsies of Isaac and Doella, found that Isaac had been stabbed approximately 18 times in the head, neck, chest, abdomen, and right hand, resulting in the penetration of his heart and left lung.  And Dr. Jordan found that Doella had been stabbed approximately 36 times: 24 times in her chest, shoulders, and upper arms, resulting in the penetration of her heart and lungs; 4 times in her abdomen, resulting in the penetration of her liver and left kidney; 2 times in her right thigh; 5 times in her back; and 1 time in her left wrist.  Isaac and Doella, whose deaths were relatively contemporaneous, were killed sometime between March 9, 1992, at 11:30 a.m. and March 10, 1992, at 11:30 a.m.

On the morning of March 9, 1992, Roderick Rancher, who lived a few blocks from Isaac and Doella, saw Wesley, who was living with Isaac and Doella, walking down the street. Wesley was sweaty, which was peculiar to Rancher since it was chilly outside.  Wesley asked Rancher if he wanted to buy a VCR, television set, or a microwave.  Rancher said that he did, and then Wesley asked if Rancher knew where Wesley could buy drugs.  After Rancher said he did not know, he gave Wesley a ride to Isaac and Doella's house.  Later that morning, as Rancher was driving to work, he drove by Isaac and Doella's house, and Wesley approached his car about Rancher purchasing an appliance.  Wesley was wearing a robe and had a towel

---

[5] These facts are taken from the trial transcripts.  ECF Nos. 35-1, 36-1, 36-2, 36-3, 37-1, 37-2, 38-1, 38-2, 39-1, 39-2, 39-3, 39-4.  For simplicity's sake, I cite to these exhibits generally for this entire fact section.  I make no credibility findings or other factual findings regarding the truth or falsity of this summary of the evidence from the state court.  This summary is merely a backdrop to my consideration of the issues.

wrapped around his left hand.  There was something red around the towel and specks of something red on the robe.  Rancher inquired about the red substances, and Wesley said that he had cut his hand while cutting a chicken.

Robert Walker, a longtime neighbor of Isaac and Doella, saw Wesley on March 10, 1992, driving Isaac's truck.  This was unusual because only Isaac and Doella drove the truck.  Walker asked Wesley about Isaac, and Wesley told him that Isaac was in Green Valley working.  Wesley went into the house and then left 15–20 minutes later in the truck.  Later that day, Walker and his nephew went looking for Isaac, and after peeking through the window of Isaac and Doella's house, they saw Isaac lying on the floor.  The doors to the house were locked, so Walker called Isaac's daughters and law enforcement.

Isaac's grandson, Anthony Carter, responded to the house and told law enforcement that he believed he knew where Wesley, his uncle, was at that time.  Carter took a law enforcement officer to a friend's house to look for Wesley and saw his grandfather's truck there, which was unusual because he had never seen Wesley drive that truck before.  Officer Robert Plummer observed Wesley's behavior when he was told that Isaac and Doella had been killed.  According to Officer Plummer, Wesley had no reaction, but it was obvious that Wesley was intoxicated at the time.

Detective Norman Ziola interviewed Wesley that day, March 10, 1992, a Tuesday, and Wesley told him that he had not seen Isaac or Doella nor been to their house since Sunday.  Detective Ziola noticed cuts and abrasions on Wesley's hands.  During the interview, Wesley's blood alcohol content was .12, and he had Benzoylecgonine, the metabolite for cocaine, in his system.

Wesley had a three-year old son, Aqueel, with Jackie Blood.  Wesley and Blood were no longer in a relationship, but Blood would bring Aqueel to Isaac and Doella's house frequently.  Blood saw Wesley on Sunday, March 8, 1992, when Wesley dropped Aqueel off at Blood's place of employment.  Wesley and Blood got into an argument, resulting in Wesley getting kicked off the property by security.  Blood called Isaac to tell him that Aqueel would not be going over to his house "anymore because someone was going to end up getting hurt" because

Wesley and Blood "couldn't see eye to eye on anything."  Blood also told Isaac that she wanted him to get Aqueel's stuff together and bring it over and that he was welcome to see Aqueel at her house.  Isaac was upset at the news that Aqueel would not be coming over anymore.  Blood next saw Wesley on Tuesday morning standing in the front yard in a robe while she just happened to be driving by.  Blood testified that Wesley had a serious drug problem.

**B.    Procedural history**

A jury convicted Wesley of robbery with the use of a deadly weapon and two counts of first-degree murder with the use of a deadly weapon.[6]  Wesley was sentenced to death.[7]  Wesley appealed, and the Nevada Supreme Court affirmed the judgment of conviction and denied rehearing.[8]  Wesley petitioned for a writ of certiorari, but the United States Supreme Court denied relief.[9]

Wesley filed a state petition for postconviction relief.[10]  The state court denied the petition.[11]  Wesley appealed, and the Nevada Supreme Court affirmed in part, reversed in part, and remanded for a new penalty hearing.[12]  After that new penalty hearing,[13] an amended judgment of conviction was entered sentencing Wesley to, *inter alia*, two consecutive life sentences without the possibility of parole.[14]

---

[6] ECF No. 18-1.

[7] *Id*.

[8] ECF Nos. 18-3, 42-5.

[9] ECF No. 42-12.

[10] ECF No. 41-29.

[11] ECF No. 44-6.

[12] ECF No. 18-6.

[13] ECF No. 46-39.

[14] ECF No. 18-7.

Wesley dispatched his federal habeas corpus petition on April 26, 2020.[15]  I appointed counsel for Wesley,[16] and a first-amended petition and second-amended petition were filed.[17]  Respondents moved to dismiss grounds 1 and 3.[18]  I granted the motion in part, finding that grounds 1 and 3 were technically exhausted but procedurally defaulted.[19]  I deferred a decision on whether Wesley can demonstrate cause and prejudice under *Martinez v. Ryan*[20] to overcome the procedural default of grounds 1 and 3 until after the parties addressed the claims on their merits.[21]  Respondents answered the petition, and Wesley replied.[22]

## Discussion

**A.    Legal standards**

       *1.    Review under the Antiterrorism and Effective Death Penalty Act (AEDPA)*

If a state court has adjudicated a habeas corpus claim on its merits, a federal district court may grant habeas relief with respect to that claim only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[23]  A state court acts contrary to clearly established federal law if it applies a rule contradicting the relevant holdings or reaches a different

---

[15] ECF No. 6.

[16] ECF No. 8.

[17] ECF Nos. 17, 25.

[18] ECF No. 32.

[19] ECF No. 61.

[20] *Martinez v. Ryan*, 566 U.S. 1 (2012).

[21] ECF No. 61.

[22] ECF Nos. 70, 77.

[23] 28 U.S.C. § 2254(d).

conclusion on materially indistinguishable facts.[24]  And a state court unreasonably applies clearly established federal law if it engages in an objectively unreasonable application of the correct governing legal rule to the facts at hand.[25]  Section 2254 does not, however, "require state courts to *extend*" Supreme Court precedent "to a new context where it should apply" or "license federal courts to treat the failure to do so as error."[26]  The "objectively unreasonable" standard is difficult to satisfy;[27] "even 'clear error' will not suffice."[28]

Habeas relief may be granted only if "there is no possibility [that] fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."[29] As "a condition for obtaining habeas relief," a petitioner must show that the state-court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."[30]  "[S]o long as 'fairminded jurists could disagree' on the correctness of the state court's decision," habeas relief under Section 2254(d) is precluded.[31]  AEDPA "thus imposes a 'highly deferential standard for evaluating state-court rulings'. . . and 'demands that state-court decisions be given the benefit of the doubt.'"[32]

---

[24] *Price v. Vincent*, 538 U.S. 634, 640 (2003).

[25] *White v. Woodall*, 134 S. Ct. 1697, 1705–07 (2014).

[26] *Id*. at 1705–06 (emphasis in original).

[27] *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013).

[28] *Wood v. McDonald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) (citation omitted); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

[29] *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

[30] *Id*. at 103.

[31] *Id*. at 101.

[32] *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations omitted).

If a federal district court finds that the state court committed an error under § 2254, the district court must then review the claim de novo.[33]  The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief,[34] but state-court factual findings are presumed correct unless rebutted by clear and convincing evidence.[35]

### 2. *Standard for federal habeas review of an ineffective-assistance claim*

The right to counsel embodied in the Sixth Amendment provides "the right to the effective assistance of counsel."[36]  Counsel can "deprive a defendant of the right to effective assistance[] simply by failing to render 'adequate legal assistance[.]'"[37]  In *Strickland v. Washington*, the United States Supreme Court held that an ineffective-assistance claim requires a petitioner to show that: (1) his counsel's representation fell below an objective standard of reasonableness under prevailing professional norms in light of all of the circumstances of the particular case;[38] and (2) it is reasonably probable that, but for counsel's errors, the result of the proceeding would have been different.[39]

"A reasonable probability is a probability sufficient to undermine confidence in the outcome."[40]  Any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct so as to avoid the distorting effects of hindsight.[41]  "The question is whether an attorney's representation amounted to

---

[33] *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

[34] *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

[35] 28 U.S.C. § 2254(e)(1).

[36] *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).

[37] *Id*. (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 335–36 (1980)).

[38] *Id*. at 690.

[39] *Id.* at 694.

[40] *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000).

[41] *Strickland*, 466 U.S. at 689.

incompetence under prevailing professional norms, not whether it deviated from best practice or most common custom."[42]  The burden is on the petitioner to overcome the presumption that counsel made sound trial-strategy decisions.[43]

If a state court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult.[44] *Strickland* and § 2254(d) are highly deferential, and when the two apply in tandem, review is doubly so.[45]  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable [but] . . . whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."[46]

**B.    Evaluating Wesley's claims**

*1.    Ground 1—trial counsel failed to move to recuse the trial judge*

In ground 1 of his second-amended petition, Wesley alleges that he received ineffective assistance of counsel when his attorneys failed to move to recuse the trial judge due to a conflict of interest.[47]  I previously determined that this ground is technically exhausted because it would be procedurally barred in the state courts.[48]  I deferred a decision on whether Wesley can demonstrate cause and prejudice to overcome the procedural default until now.[49]

---

[42] *Richter*, 562 U.S. at 104.

[43] *Id*.

[44] *See id*. at 104–05.

[45] *Id*. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential.").

[46] *Richter*, 562 U.S. at 105.

[47] ECF No. 25 at 6.

[48] ECF No. 61 at 5.

[49] *Id*.

### a.    Procedural default

Under *Martinez v. Ryan*, a petitioner can demonstrate cause to potentially overcome the procedural default of a claim of ineffective assistance of trial counsel by demonstrating that either (a) he had no counsel during the state postconviction proceedings or (b) his counsel was ineffective.[50]  To demonstrate prejudice under *Martinez*, the petitioner must show that the defaulted claim of ineffective assistance of trial counsel is a "substantial" claim.[51]  A claim is "substantial" for purposes of *Martinez* if it has "some merit."[52]  This standard does not require a showing that the claim will succeed, just that its proper disposition could be debated among reasonable jurists.[53]

The principal issues, in context,[54] are: (1) whether Wesley's state postconviction counsel was ineffective in raising this claim in the state court; (2) whether Wesley's ineffective-assistance-of-trial-counsel claim is substantial; and (3) if so, whether, on the merits, Wesley was denied effective assistance of trial counsel.[55]  On all of these issues, review is *de novo*.[56]

Respondents argue that Wesley cannot show that his postconviction counsel was ineffective because he raised this ground before the state court but simply omitted it from Wesley's postconviction appeal to the Nevada Supreme Court.[57]  In his supplement to his *pro se* state habeas petition, Wesley argued that he "was deprived of effective assistance of counsel

---

[50] *Martinez*, 566 U.S. at 14.

[51] *Id.*

[52] *Id.*

[53] *See generally Miller-El v. Cockrell*, 537 US. 322, 336–38 (2003).

[54] It is not disputed (1) that a state postconviction proceeding in the state court was an initial-review collateral proceeding for purposes of *Martinez*, or (2) that Nevada procedural law sufficiently requires an inmate to present a claim of ineffective assistance of trial counsel for the first time in that proceeding for purposes of applying the *Martinez* rule.  *See generally Rodney v. Filson*, 916 F.3d 1254, 1259–60 (9th Cir. 2019).

[55] *See, e.g., Atwood v. Ryan*, 870 F.3d 1033, 1059–60 (9th Cir. 2017); *Detrich v. Ryan*, 740 F.3d 1237, 1243–46 (9th Cir. 2013).

[56] *See Ramirez v. Ryan*, 937 F.3d 1230, 1243 (9th Cir. 2019); *Atwood*, 870 F.3d at 1060 n.22.

[57] ECF No. 70 at 29.

9

under the state and federal constitutions by the failure of counsel representing [him] at trial to seek recusal of the trial judge who presided over [his] capital cased based on the available evidence of his relationship with one of the prosecuting attorneys, and to preserve that issue for state and federal review."[58] Later, Wesley's state postconviction counsel incorporated the issues from Wesley's supplemental *pro se* state habeas petition into his counseled supplemental state habeas petition.[59]

Wesley rebuts that he attempted to raise this ground in his *pro se* petition, but his claim lacked the same depth of facts as the current claim and lacked any legal support, making the current ground fundamentally altered from the weaker claim he attempted to plead *pro se*.[60] Wesley also argues that, although his postconviction counsel incorporated this ground from Wesley's *pro se* petition, he effectively abandoned it at the state court level by not arguing it.[61]

Because (1) Wesley included this ground in his *pro se* petition—albeit not in as much depth as the current ground—and (2) his postconviction counsel incorporated it within his counseled supplemental state habeas petition, I find that Wesley fails to demonstrate that his postconviction counsel was ineffective. But even if postconviction counsel raised this claim deficiently—for example, by not including further argument, facts, or legal citations in Wesley's counseled supplemental state habeas petition—I find, for the reasons discussed below, that Wesley fails to demonstrate prejudice to excuse the procedural default because his ineffective-assistance-of-trial-counsel claim is not substantial.

### b. *Background information*

In 1999, four years after Wesley's trial, Wesley's second-chair trial counsel was deposed and testified that (1) on February 21, 1995, a week before Wesley's trial was scheduled to start, she received information from another attorney in the Clark County Public Defender's Office

---

[58] ECF No. 42-28 at 5–6.

[59] ECF No. 43-29 at 21.

[60] ECF No. 77 at 15.

[61] *Id*. at 15–16.

that there was a rumor that Vicki Monroe, the second-chair prosecutor during Wesley's trial, and the trial judge were "dating"; (2) based on that information, she asked other members of the state bar about the rumor and learned that several people had heard the same news; (3) one unnamed individual had seen Monroe and the trial judge at dinner and commented to them that their dining together may be inappropriate, embarrassing the trial judge and Monroe; (4) that same unnamed individual also saw Monroe and the trial judge eating dinner with Monroe's mother; (5) Wesley's lead trial counsel told her that he had seen Monroe and the trial judge dancing and drinking together at a wedding and later heard that Monroe and the trial judge had left the wedding together; (6) another attorney told her that he asked Monroe if she was dating the trial judge, and Monroe smiled but did not answer; (7) an in-chambers conference was held on February 23, 1995, between the parties and the trial judge regarding the issue of recusal of Monroe, and neither Monroe nor the trial judge denied that there was an inappropriate relationship; (8) during the in-chambers conference, Wesley's lead trial counsel stated that the defense was withdrawing their oral motion to recuse Monroe; (9) her boss told her not to file a formal recusal motion; and (10) the conflict between her and Wesley's lead trial counsel— regarding her view that recusal should be sought and his view that recusal should be dropped— strained their co-counsel relationship, which affected the quality of their representation of Wesley.[62]

Wesley's lead trial counsel was also deposed in 1999 and testified that (1) Wesley's second-chair trial counsel informed him of her concerns about the relationship between Monroe and the trial judge; (2) he did not find Monroe and the trial judge having dinner to be unusual because he had been out to dinner with each of them himself; (3) he did not see Monroe and the trial judge dancing together at the wedding; (4) at the in-chambers conference held on February 23, 1995, Wesley's second-chair trial counsel made an oral motion for recusal because "she felt [it] was inappropriate for the Court to hear the case or for the D.A., Ms. Monroe, to be on the case"; (5) during that in-chambers conference, he could not "remember which was more pushed,

---

[62] ECF No. 54-2 at 17, 21, 24–25, 27, 39–41, 56, 66, 70.

recuse the judge or to have the D.A. recused"; (6) there was no resolution during that in-chambers conference, so a hearing was held later that day on the record; (7) the trial judge treated Wesley's second-chair trial counsel more critically after these proceedings, but he did not think it rose to "an egregious state" or adversely affected Wesley; and (8) as lead counsel, he decided that a formal motion for recusal should not be filed "because [he] didn't think there was anything to substantiate the motion."[63]  Regarding the last point, Wesley's lead trial counsel testified that, absent concrete proof of an inappropriate relationship, he did not believe there was anything untoward going on between Monroe and the trial judge because they were professionals and would have disclosed such a relationship:

> I didn't think there was a relationship between Vicki Monroe and the judge. And unless there was more than the innuendo or the fact that somebody saw them at dinner, it wasn't worth pursuing for the fact that my belief and still my opinion of both the judge and the D.A. that if there was some unprofessional conduct or conduct that would appear to be unprofessional during the trial proceeding, either one of them independently would have brought that to the court's attention or both of them to the attention of the proceeding.[64]

Wesley's lead trial counsel supported his views on Monroe and the trial judge's lack of an intimate relationship based on his personal knowledge of their circumstances:

> At that point in time I had been friends with Ms. Monroe for a number of years. We started in the D.A.'s office together. I knew she was in a rather long-term relationship herself with somebody.  I think today they are still in a relationship. And [the trial judge] wasn't engaged, but he became engaged shortly thereafter.  I knew of that relationship.  I had been out with them both socially before, so it was just my opinion that there was no basis for it.  If in fact it was true that they had been seen at dinner, it was nothing more than just friends going to dinner.[65]

   A formal hearing was held on February 23, 1995, following the in-chambers conference. During that hearing, Wesley's second-chair trial counsel brought four concerns to the trial court's attention: (1) "we were told that on one occasion, your Honor, Ms. Monroe, and Ms. Monroe's mother dined together in the evening"; (2) "[o]n another occasion, . . . we were

---

[63] ECF No. 54-1 at 9, 11–12, 14, 18, 22–24, 27, 29, 37, 39, 41.

[64] *Id*. at 16.

[65] *Id*. at 22.

informed that your Honor dined with Ms. Monroe alone"; (3) "[o]n another occasion, we were

informed that your Honor and Ms. Monroe and presumably a group of individuals . . . dined at

the Z Tejas Grill"; and (4) "it was suggested that [the trial judge] and Ms. Monroe were seen

dancing and drinking together [at a wedding] and one individual suggested that you may have

left that reception together."[66]  Wesley's second-chair trial counsel then asked the court to recuse

Monroe "because that is probably the easiest way to proceed and to have everything covered so

that the case can go forward on Monday."[67]  Wesley's second-chair trial counsel did not request

recusal of the trial judge because "that would work a hardship on all the parties since your Honor

is familiar with the case."[68]  The trial judge stated, based on his "own oath . . . as a District Court

Judge," that his "relationship with Ms. Monroe is one of professional friendship."[69]  The trial

judge then went through each of the four concerns to dispel any inappropriate relationship,

resulting in him declining to remove Monroe:

> I did dine with Ms. Monroe and her mother and this is how that went.  After
> court one day, I went down to the restaurant that's in the basement of the Valley
> Bank Building that's known as the "Legal Beagle."  I went there myself simply to
> have a cocktail after work and go home.  Ms. Monroe happened to be there with
> her mother.  This is my recollection of it.  We talked for awhile, we went to dinner
> at another restaurant, they went their way, Ms. Monroe's mother and herself, and I
> went home.
>
> Another incident, I believe, I have had an evening with me and Ms. Monroe
> on another occasion.  I think that was at the Café Michelle Restaurant.  She went
> home and I went home.
>
> The Z Tejas Grill "citing," I have absolutely no recollection of it.  I could
> be corrected, I suppose, but I just don't think that ever happened.
>
> And the wedding . . . , I sat at the same table with Ms. Monroe and a number
> of other people for a time.  It was during the election and I have to tell you that I
> probably shook hands and sat with probably almost everybody in the room at that
> point.  There was a prolonged wedding reception with dining and dancing. I was a
> late entry.  I got there late. . . . I left there by myself and I went there by myself and

---

[66] ECF No. 53-1 at 5.

[67] *Id*. at 6.

[68] *Id*.

[69] *Id*. at 11.

1

2

3

4

> left by myself.  I danced one dance with Ms. Monroe.  That was it.  I danced with several other of the people . . . .

> There is utterly no way that any of these I hate to dignify them by calling them incidents, but there is absolutely nothing with my interaction with anyone in this courtroom that would affect my ability to fairly and impartially rule on any issue in the case and I think it would be blatantly unfair to me to, based upon nothing, to require the district attorney to remove an attorney from the case.[70]

5

6

7

8

9

10

The trial court stated that "[i]f the parties still believe that [he] should recuse [him]self from this case or if they have come of that belief, [he would] hear from them at this point."[71]  Although Wesley's defense counsel did not move for recusal of the trial judge, the trial judge commented: "For my own part, I would resign my office before I would disgrace it.  I don't see the need to recuse myself.  I don't see that I have done anything that I have to be ashamed of nor, in my opinion, is there anything that effects my impartiality."[72]

11

12

13

14

15

16

17

18

19

In 2005, at Wesley's postconviction evidentiary hearing, Wesley's lead trial counsel testified that (1) he "saw nothing out of the ordinary" regarding the relationship between Monroe and the trial judge, (2) that the trial judge "was probably upset by the issue that was raised," (3) it was his impression that the defense was "being held differently than the State" after the issue had been raised, and (4) he hoped that Wesley's second-chair trial counsel "didn't hold it against [him] that [he] just didn't back her on that specific issue."[73]  Wesley's second-chair trial counsel then testified that, regarding the prejudicial impact that arose from the recusal issue, "the Judge raise[d] the specter of negative implications for my bar license."[74]  She also testified that "far more zealous advocacy was called for" regarding the defense's representation of Wesley.[75]

20

21

22

23

24

25

26

27

28

---

[70] *Id*. at 12–14.

[71] *Id*. at 15.

[72] *Id*. at 16.

[73] ECF No. 44-1 at 9–10, 33.

[74] *Id*. at 55.

[75] *Id*. at 60.

### c.    Standard for a fair trial by a fair tribunal

"A fair trial in a fair tribunal is a basic requirement of due process,"[76] and fairness "requires an absence of actual bias in the trial of cases," however, it is "endeavored to prevent even the probability of unfairness."[77]  This "most basic tenet of our judicial system helps to ensure both the litigants' and the public's confidence that each case has been adjudicated by a neural and detached arbiter."[78]  "[T]he floor established by the Due Process Clause clearly requires a . . . judge with no actual bias against the defendant or interest in the outcome of his particular case."[79]  Recusal is warranted when "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable."[80]  "Every procedure [that] would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law."[81]

### d.    Nevada law on seeking recusal of a trial judge

Nevada law provides that "[a] judge shall not act as such in an action or proceeding when the judge entertains actual bias or prejudice for or against one of the parties to the action."[82]  If "[a]ny party to an action or proceeding pending in any court . . . seeks to disqualify a judge for actual or implied bias or prejudice," that party "must file an affidavit specifying the facts upon which the disqualification is sought."[83]  The judge must "immediately transfer the case to

---

[76] *In re Murchison*, 349 U.S. 133, 136 (1955).

[77] *Id.*; *see also Greenway v. Schriro*, 653 F.3d 790, 806 (9th Cir. 2011) ("A showing of judicial bias requires facts sufficient to create actual impropriety or an appearance of impropriety.").

[78] *Hurles v. Ryan*, 752 F.3d 768, 788 (9th Cir. 2014).

[79] *Bracy v. Gramley*, 520 U.S. 899, 904–05 (1997); *see also Tumey v. Ohio*, 273 U.S. 510, 523 (1927) (explaining that a defendant is denied due process if the judge "has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case").

[80] *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).

[81] *Tumey*, 273 U.S. at 532.

[82] Nev. Rev. Stat. § 1.230(1).

[83] Nev. Rev. Stat. § 1.235.

another department of the court" and "may challenge an affidavit alleging bias or prejudice by filing a written answer with the clerk of the court within 5 judicial days after the affidavit is filed, admitting or denying any or all of the allegations contained in the affidavit and setting forth any additional facts which bear on the question of the judge's disqualification."[84]  "The question of the judge's disqualification must thereupon be heard and determined by another judge."[85]

### e.    *Analysis*

Wesley fails to demonstrate that his trial counsel acted deficiently.  Wesley's lead trial counsel testified that he decided not to pursue filing a motion for recusal—either recusal of Monroe or the trial judge—because there was not enough to substantiate the allegations of bias. In support of this decision, Wesley's lead trial counsel testified that he had dined alone with both Monroe and the trial judge, making their dining together not bothersome; he knew Monroe and the trial judge personally and trusted they would have sought to recuse themselves if necessary; and he knew Monroe and the trial judge to each be in romantic relationships with other people, signaling that their relationship was professional.  And Wesley's second-chair trial counsel stated at the hearing on February 23, 1995, that she sought recusal of only Monroe—not the trial judge—because the trial was scheduled to start in less than a week, and she wanted the trial judge to preside over the trial.  These strategic decisions to refrain from moving to recuse the trial judge were reasonable and are entitled to deference.[86]

Moreover, Wesley fails to demonstrate prejudice.  Even if his trial counsel had filed a formal affidavit to recuse the trial judge, the trial judge could have filed an answer denying the allegations.  It is mere speculation that another judge hearing the question of the trial judge's disqualification would have granted the recusal request, especially given the trial judge's explanations regarding his relationship with Monroe that it was only happenstance that he met

---

[84] *Id*.

[85] *Id*.

[86] *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); *see also Correll v. Ryan*, 539 F.3d 938, 948 (9th Cir. 2008) ("[U]nder *Strickland*, we must defer to trial counsel's strategic decisions.").

1    Monroe and her mother for dinner; his dining with Monroe alone was purely professional; and he

2    danced with Monroe for only one song at the wedding of a mutual colleague, a wedding at which

3    he danced with many other people as well.[87]  In fact, the trial judge adamantly denied any bias,

4    explaining that he "would resign [his] office before [he] would disgrace it."

5            Based on the record, Wesley's ineffective-assistance-of-trial-counsel claim is not

6    substantial because Wesley fails to demonstrate deficiency or prejudice under *Strickland*.  And

7    without that requisite cause and prejudice necessary to overcome the procedural default of

8    ground 1, I dismiss it.

9            **2.    *Ground 2—the trial court's failure to recuse Monroe***

10           In ground 2 of his second-amended petition, Wesley alleges that he was denied due

11   process when the trial court failed to recuse Monroe.[88]  In affirming Wesley's judgment of

12   conviction, the Nevada Supreme Court concluded that the trial court acted properly because there

13   was inadequate proof of an inappropriate relationship between the trial judge and Monroe:

14           Before trial, Wesley's counsel requested that the district court recuse a

15   deputy district attorney from this case because of an alleged personal relationship
     between the female deputy district attorney and the male district judge. The right

16   to a fair trial incorporates the right to have a trial presided over by a judge who is
     free from bias or prejudice. Bias and prejudice mean, among other things, undue

17   favoritism toward one of the litigants. *See State v. Hill*, 848 P.2d 1375, 1381–83
     (Ariz. 1993).  Further, courts must avoid any appearance of partiality, not merely

18   to secure the confidence of litigants in a case, but to assure the public that fair
     results, meriting respect, follow every judicial determination. NCJC Canon 2;

19   *People v. Hrapski*, 718 P.2d 1050, 1054 (Colo. 1986).

20           The district judge in this case admitted that a relationship existed between
     the deputy district attorney and himself, but explained that the relationship was

21   merely professional.  Wesley failed to present any non-speculative evidence that
     the judge had anything more than a professional relationship with the deputy district

22   attorney.  Also, the judge stated under oath that as an attorney for twenty-two years
     before taking the bench, and as a judge and active member of the State Bar, he

23   personally knows nearly every attorney in Clark County.  Without more proof of
     an intimate relationship, we conclude that the judge in this case acted properly by

24   refusing to recuse the deputy district attorney.

25

26   ───────────────────────
     [87] *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("*Strickland* prejudice is not established

27   by mere speculation.").

28   [88] ECF No. 25 at 14.

[FN1] This opinion does not reach the question of whether the district court has the authority to recuse a certain member of the district attorney's office from a case.[89]

The Nevada Supreme Court's conclusion that the trial court did not err by refusing to recuse Monroe was reasonable. As the Nevada Supreme Court reasonably noted, Wesley failed to demonstrate that Monroe and the trial judge had more than just a professional relationship. Indeed, the trial judge was in a unique position to know whether the relationship was anything more than a professional relationship given his part in the relationship. Lacking a showing that the relationship between Monroe and the trial judge was improper, Wesley fails to substantiate any bias to show that his trial was unfair and violated due process. Because the Nevada Supreme Court's determination constitutes an objectively reasonable application of clearly established federal law and was not based on an unreasonable application of the facts, Wesley is not entitled to federal habeas relief for ground 2.

### 3.    *Ground 3—trial counsel failed to investigate the case*

In ground 3 of his second-amended petition, Wesley alleges that he received ineffective assistance of trial counsel when his attorneys failed to investigate the case and present a defense, including (1) investigating other suspects to explain the fingerprint and partial palm print that did not match Wesley or the victims, which was compounded by their failure to effectively cross-examine the prosecution's expert witnesses; and (2) investigating Wesley's mental and intellectual deficiencies and abuse of drugs and alcohol at the time of the crime to show that he lacked the ability to form the requisite intent to commit first-degree murder.[90] As with ground 1, I previously determined that this ground is technically exhausted because it would be procedurally barred in the state courts, deferring a decision on whether Wesley can demonstrate cause and prejudice under *Martinez* to overcome the procedural default.[91] Under a *de novo*

---

[89] ECF No. 18-3 at 5–6.

[90] ECF No. 25 at 16–20.

[91] ECF No. 61 at 5.

1  standard, I now consider whether Wesley's ineffective-assistance-of-trial-counsel claim is

2  substantial.[92]

3      Defense counsel has a "duty to make reasonable investigations or to make a reasonable

4  decision that makes particular investigations unnecessary."[93]  Additionally, "[i]n any

5  ineffectiveness case, a particular decision not to investigate must be directly assessed for

6  reasonableness in all the circumstances, applying a heavy measure of deference to counsel's

7  judgments."[94]  This investigatory duty includes investigating the defendant's most important

8  defenses[95] and evidence that demonstrates factual innocence or evidence that raises sufficient

9  doubt about the defendant's innocence.[96]  In assessing counsel's investigation, the court must

10 conduct an objective review of counsel's performance, measured for "reasonableness under

11 prevailing professional norms."[97]  This includes a context-dependent consideration of the

12 challenged conduct as seen "from counsel's perspective at the time."[98]  Furthermore, "strategic

13 choices made after thorough investigation of law and facts relevant to plausible options are

14 virtually unchallengeable."[99]

15     I first turn to Wesley's assertion that his trial counsel rendered ineffective assistance by

16 failing to investigate other suspects to explain the latent prints found at the crime scene.  During

17 the guilt phase of the trial, the prosecution presented the testimony of Munson Moser, a latent-

18 print examiner with the Las Vegas Metropolitan Police Department.  Moser testified about the

19 latent prints that were recovered from the crime scene and the comparisons he was able to make

---

[92] Because I conclude that Wesley's ineffective-assistance-of-trial-counsel claim is not substantial, I do not reach the question of whether his postconviction counsel was ineffective.

[93] *Strickland*, 466 U.S. at 691.

[94] *Id*.

[95] *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994).

[96] *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999).

[97] *Strickland*, 466 U.S. at 688.

[98] *Id*. at 689; *see also Wiggins v. Smith*, 539 U.S. 510, 523 (2003).

[99] *Strickland,* 466 U.S. at 690.

and not make to those prints: (1) he determined that a latent print found on the left side of the telephone belonged to Wesley, (2) he determined that several latent prints on a 40-ounce Colt 45 beer bottle found in the trashcan in the hallway bathroom belonged to Wesley, (3) he found that several other prints on the 40-ounce Colt 45 beer bottle could not be identified, although he could not eliminate Wesley, Isaac, or Doella as the source, (4) he determined that partial prints found on the backside of a chair could not be identified, but Wesley, Isaac, and Doella were eliminated as the source, (5) he determined that partial prints found on a photograph on the back of a magazine on the dining room table lacked enough identifiable characteristics, and (6) he determined that a partial print on a magazine belonged to Isaac.[100]  During closing argument, Wesley's trial counsel discussed the lack of identification for the prints found on the beer bottle and the backside of the chair: "[o]ne thing that we do know is that the investigation was so pinpointed toward Herbert Wesley and that no other suspect was even considered."[101]  Wesley's trial counsel continued: "Was that unknown print a suspect?  Was the unknown print a perpetrator?  We don't know."[102]

Although it does not appear that Wesley's trial counsel investigated other suspects to explain the unidentified latent prints found at the crime scene, Wesley fails to demonstrate a deficiency.  It is unclear if the unidentified prints were even able to be further tested to identify another suspect.  And Wesley's trial counsel was able to use the prosecution's lack of further testing of the prints to discredit the criminal investigation and argue that the prosecution failed to meet their burden.[103]

Wesley also fails to allege or demonstrate any prejudice.  It is mere speculation that investigating the prints would have proven fruitful in producing other suspects.  And even if the prints could have been linked to other individuals, they were located on rather innocuous items: a

---

[100] ECF No. 38-1 at 110, 119–123.

[101] ECF No. 39-3 at 16.

[102] *Id*. at 17.

[103] *See id*.

beer bottle in a trashcan and the back of a chair—items that, unlike the knife, for example, had no direct connection with the murder.

Wesley's assertion that his trial counsel rendered ineffective assistance by failing to investigate his mental and intellectual deficiencies and abuse of drugs and alcohol at the time of the crime also fails. During the penalty phase of Wesley's trial, the defense presented Karen Kampfer, a psychometrist, who testified that she administered the WAIS-R on Wesley on February 23, 1995, and determined that Wesley's IQ was 77, which was in the borderline range between low average and "mentally retarded."[104] So his trial counsel did investigate his mental and intellectual deficiencies prior to the trial. And regarding Wesley's drug and alcohol abuse, his trial counsel argued during closing argument that Wesley lacked the specific intent to commit the crimes due to his alcohol and drug abuse:

> You have heard Herbert may have been drinking and perhaps binging on cocaine during those windows of a couple of days. At the time of his arrest, there is no question they were recalling the blood alcohol level at the time of his . . . testing subsequent to his arrest of a .12. You also heard evidence that at the time of his testing subsequent to his arrest, he had Benzoylecgonine in his system, which we heard was the byproduct or the metabolite of cocaine.
>
> Now we've heard evidence that that can last in your system for up to 24 hours, depending when it's ingested, but you also heard Mrs. Errichetto indicate that if a person continually took cocaine, that he would have Benzoylecgonine in his system virtually all the time. So at the time of both of his testing and most likely at the time when Rancher sees him, he is on alcohol and/or cocaine. Rancher indicates that he is very fidgety, very nervous, and that he asks him where he can find drugs.
>
> Now what is the import of all of that? . . . [I]ntoxication may be taken into consideration in determining . . . purpose, motive or intent and . . . it has the effect of lessening the degree of the homicide.[105]

It is unclear what further investigation Wesley believes his trial counsel should have done involving his drug and alcohol abuse, especially since there was evidence presented at trial of this abuse. Indeed, Wesley's ex-girlfriend testified that Wesley had a serious drug problem.

---

[104] ECF No. 40-2 at 70–75.

[105] ECF No. 39-2 at 8–9.

Wesley also fails to demonstrate prejudice.  Wesley points to two neuropsychological examinations that were performed two decades after his trial to argue the ineffectiveness of his trial counsel.  First, Sharon Jones-Forrester, Ph.D. performed a neuropsychological examination on Wesley on January 26, 2015, diagnosing him with unspecified neurocognitive disorder, attention-deficit/hyperactivity disorder, and specific learning disorder with impairment in reading.[106]  Second, Paul D. Connor, Ph.D. performed a neuropsychological examination on Wesley on January 12, 2016, concluding that Wesley's "current and historical pattern of functioning is consistent with the DSM-diagnosis of Neurodevelopmental Disorder Associated with Prenatal Alcohol Exposure."[107]

Even assuming that these neuropsychological examinations would have yielded the same results decades earlier, it is far from clear that this supplemental evidence—i.e., knowing that Wesley suffered from mental and intellectual deficiencies—would have changed the jury's guilty verdict.  Although evidence of Wesley's deficiencies could have been used as mitigation evidence during the penalty hearing, Wesley's death sentence has already been vacated.  And, in light of the horrifyingly violent facts of the murder—Wesley stabbing his father and stepmother an aggregate of 54 times in order to allegedly sell their appliances for drug money—I find that it is merely speculation that this supplemental evidence would have altered the jury's verdict during the guilt phase of the trial,[108] especially since a diminished-capacity defense is not available in Nevada.[109]

In sum, based on the record, Wesley's ineffective-assistance-of-trial-counsel claim is not substantial because Wesley fails to demonstrate deficiency or prejudice under *Strickland*.

---

[106] ECF No. 54-3 at 9.

[107] ECF No. 54-4 at 13.

[108] *See, e.g., Wong v. Belmontes*, 558 U.S. 15, 27–28 (2009) ("It is hard to imagine expert testimony and additional facts about Belmontes'[s] difficult childhood outweighing the facts of [the] murder.").

[109] *See Crawford v. State*, 121 P.3d 582, 591 (2005).

Because Wesley fails to demonstrate requisite prejudice necessary to overcome the procedural default of ground 3, I dismiss it.

### 4.    *Ground 4—trial court gave an invalid instruction*

In ground 4 of the second-amended petition, Wesley alleges that he was denied due process when the trial court gave an invalid jury instruction on premeditation and deliberation because it failed to provide the jury with any rational or meaningful guidance as to the concept of premeditation and deliberation and eliminated any rational distinction between first-degree and second-degree murder.[110]

### a.    *Background information*

Jury instruction number 12 provided that "[m]urder of the First Degree is . . . (a) [a]ny kind of willful, deliberate and premeditated killing with malice aforethought; and/or (b) [a]ny kind of killing committed in the perpetration or attempted perpetration of Robbery."[111]  And jury instruction number 13, known as the *Kazalyn*[112] instruction, defined the elements of premeditation and deliberation for first-degree murder:

> Premeditation is a design, a determination to kill, formed in the mind of the killer at any moment before or at the time of killing.
>
> Premeditation need not be for a day, an hour or even a minute.  It may be as instantaneous as successive thoughts of the mind. If the jury believes from the evidence that the act constituting the killing was preceded by and is the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.[113]

---

[110] ECF No. 25 at 20.

[111] ECF No. 53-4 at 15.

[112] *Kazalyn v. Nevada*, 825 P.2d 578, 583–84 (Nev. 1992).

[113] ECF No. 53-4 at 16.

### b.    Standard for evaluating jury instruction in federal habeas

Issues relating to jury instructions are not cognizable in federal habeas corpus unless they violate due process.[114]  The question is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' . . . not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'"[115]  And significantly, when reviewing a jury instruction, this court considers that jury instruction "in the context of the instructions as a whole and the trial record."[116]  If an instruction contains a constitutional error, the court must apply the harmless-error analysis and ask whether the error had a "substantial and injurious effect or influence in determining the jury's verdict."[117]

### c.    State court determination

In affirming, in part, the state court's denial of Wesley's state habeas petition, the Nevada Supreme Court concluded that the *Kazalyn* instruction was a correct statement of Nevada law at the time of Wesley's trial:

> Wesley contends that the district court erred by denying his claim that trial counsel were ineffective for failing to object to the premeditation instruction, commonly known as the *Kazalyn* instruction.
>
> [FN5] *Kazalyn v. State*, 108 Nev. 67, 825 P.2d 578 (1992).
>
> In *Byford v. State*, 116 Nev. 215, 233–37, 994 P.2d 700, 712–15 (2000), this court disapproved of the *Kazalyn* instruction on the mens rea required for a first-degree murder conviction based on willful, deliberate, and premeditated murder and provided the district courts with new instructions to use in the future.  Recently, in *Nika v. State*, 124 Nev. __, 198 P.3d 839, 848, 850–51 (2008), *cert. denied*, No. 09-5928, 2009 WL 2524052 (U.S. October 13, 2009), this court held that *Byford* constituted a change in state law that has no retroactive application to convictions that were final when *Byford* was decided.  Because *Byford* constituted a change in

---

[114] *Estelle v. McGuire,* 502 U.S. 62, 72 (1991); *see also Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("[W]e have never said that the possibility of a jury misapplying state law gives rise to federal constitutional error.").

[115] *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973)).

[116] *Estelle*, 502 U.S. at 72; *see also United States v. Frega*, 179 F.3d 793, 806 n.16 (9th Cir. 1999) ("In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation.").

[117] *Calderon v. Coleman,* 525 U.S. 141, 145–46 (1998).

state law, counsel had no basis for challenging the *Kazalyn* instruction as it represented a correct statement of the law at the time of Wesley's trial. *Id.* at __, 198 P.3d at 851. Accordingly, the district court did not err by denying this claim.

> [FN6] To the extent Wesley argues that appellate counsel were ineffective for not challenging the premeditation instruction on appeal, he failed to show that this issue had a reasonable probability of success. *See Kirksey v. State*, 112 Nev. 980, 998, 923 P.2d 1102, 1114 (1996). Therefore, we conclude that the district court did not err by denying this claim.[118]

### d.    Analysis

Wesley argues that the *Kazalyn* instruction, which was used in Nevada courts between 1992 and 2000, relieved the prosecution of its burden to prove every element of first-degree murder beyond a reasonable doubt.[119] In *Byford v. State*, which was decided in 2000, the Nevada Supreme Court held that the *Kazalyn* instruction "blur[red] the distinction between first- and second-degree murder" because it did not sufficiently distinguish between the distinct elements of premeditation and deliberation.[120] Later, in *Nika v. State*, the Nevada Supreme Court explained that *Byford* announced a change in state law.[121] The Nevada Supreme Court also explained that "the *Kazalyn* instruction correctly reflected Nevada law before *Byford*."[122] In *Babb v. Lozowsky*, the Ninth Circuit Court of Appeals discussed the Nevada Supreme Court's holding in *Nika* and held that "before *Byford* was decided, the *Kazalyn* instruction did not improperly relieve the State of the burden of proving all the elements of first degree murder."[123]

---

[118] ECF No. 18-6 at 10–11.

[119] *See Sandstrom v. Montana*, 442 U.S. 510, 521 (1979); *see also In re Winship*, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."); *Evanchyk v. Stewart*, 340 F.3d 933, 939 (9th Cir. 2003) ("It is a violation of due process for a jury instruction to omit an element of the crime.").

[120] *Byford v. State*, 994 P.2d 700, 713 (Nev. 2000).

[121] *Nika v. State*, 198 P.3d 839, 849 (Nev. 2008).

[122] *Id.* at 850.

[123] *Babb v. Lozowsky*, 719 F.3d 1019, 1028 (9th Cir. 2013), *overruled on other grounds by Moore v. Helling*, 763 F.3d 1011 (9th Cir. 2014).

Wesley's conviction became final on March 24, 1997,[124] when the Supreme Court of the United States denied his petition for a writ of certiorari.[125]  So Wesley's conviction became final before the Nevada Supreme Court decided *Byford* in 2000 and changed Nevada law regarding the elements of first-degree murder.  In light of the holdings in *Nika* and *Babb*, the Nevada Supreme Court reasonably concluded that the *Kazalyn* instruction given at Wesley's trial was an accurate statement of Nevada law, so the trial court's use of that instruction did not violate Wesley's federal constitutional right to due process.  Because the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, federal constitutional law, Wesley is not entitled to federal habeas relief for ground 4.

**5.    *Ground 5—prosecutor improperly argued reasonable doubt***

In ground 5 of the second-amended petition, Wesley alleges that he was denied a fair trial when the prosecutor improperly argued reasonable doubt.[126]

**a.    *Background information***

During closing arguments, the prosecutor made a comment about reasonable doubt being a gut feeling:

> Instruction Number 25 is the reasonable doubt instruction, and you've heard that mentioned throughout the course of the trial; that the State must prove beyond a reasonable doubt the defendant's guilt.
>
> And it talks to you about reasonable doubt being not mere possible doubt, but a doubt that would govern or control a person in the more weighty affairs of life.
>
> I would submit to you, ladies and gentlemen, that a weighty affair of life may be different in every case.  What may be a weighty affair for one person may not be as weighty to another person.
>
> But we all have had circumstances where we've had what we would consider a weighty affair to consider, be it buying a house, be it buying a car.

---

[124] *See* ECF No. 42-12.

[125] *See Griffith v. Kentucky*, 479 U.S. 314, 321 n.6 (1987) (explaining that a conviction becomes final when the "judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied").

[126] ECF No. 25 at 25.

And it tells you that doubt to be reasonable must be actual, not mere possibility or speculation.

Ladies and gentlemen, *if you feel it in your stomach and if you feel it in your heart that the defendant in this case robbed his parents, Ike and Doella Wesley, and murdered them with a knife, then you don't have a reasonable doubt.*[127]

In response to the italicized portion of the prosecutor's argument, during the defense's closing argument, Wesley's trial counsel commented: "I'm not sure if that's exactly a definition that's appropriate."[128]

### b.    Standard for prosecutorial misconduct

"[T]he touchstone of due[-]process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial."[129]  "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[130] The fairness of a trial is measured "by considering, inter alia, (1) whether the prosecutor's comments manipulated or misstated the evidence; (2) whether the trial court gave a curative instruction; and (3) the weight of the evidence against the accused."[131]  "[P]rosecutorial misconduct[ ] warrant[s] relief only if [it] 'had substantial and injurious effect or influence in determining the jury's verdict.'"[132]

### c.    State-court determination

In affirming Wesley's judgment of conviction, the Nevada Supreme Court held that the prosecutor's comment was likely improper but harmless:

During the prosecutor's closing statement, he argued, "[I]f you feel it in your stomach and if you feel it in your heart . . . then you don't have reasonable doubt."   Wesley contends that this statement improperly elaborated on the

---

[127] ECF No. 39-1 at 11–12 (emphasis added).

[128] ECF No. 39-3 at 27.

[129] *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

[130] *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

[131] *Tan v. Runnels*, 413 F.3d 1101, 1115 (9th Cir. 2005).

[132] *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993)).

definition of reasonable doubt. Reasonable doubt is a subjective state of near certitude. *McCullough v. State*, 99 Nev. 72, 75, 657 P.2d 1157, 1158 (1983). However, when prosecutors attempt to rephrase the reasonable doubt standard, they venture into troubled waters. *Howard v. State*, 106 Nev. 713, 721, 800 P.2d 175, 180 (1990). On this basis, the prosecutor's comment appears improper. However, we conclude that the statement was harmless. The prosecutor referred to the language of the instruction before he made the comment to which Wesley now objects. Accordingly, we conclude that the jury was properly instructed on reasonable doubt, and the prosecutor's statement did not materially alter the jury's consideration of reasonable doubt.[133]

### d.    Analysis

The Nevada Supreme Court's conclusion that the prosecutor's comment did not warrant the granting of relief was reasonable. Wesley fails to demonstrate that the prosecutor's isolated statement about reasonable doubt, although improper, had a substantial and injurious influence on the jury's verdict. As the Nevada Supreme Court reasonably noted, the jury was properly instructed on reasonable doubt by the trial court[134] and the jury instructions.[135] And as the Supreme Court has explained, "arguments of counsel generally carry less weight with a jury than do instructions from the court."[136] Thus, because the jury is presumed to follow the trial court's instructions,[137] the Nevada Supreme Court's determination that the prosecutor's misstatement of

---

[133] ECF No. 18-3 at 11–12.

[134] *See* ECF No. 39-1 at 8.

[135] The reasonable doubt instruction given during the guilt phase of the trial was:

> A reasonable doubt is one based on reason. It is not mere possible doubt but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a conviction that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to reasonable must be actual, not mere possibility or speculation.

ECF No. 53-4 at 28.

[136] *Boyde v. California*, 494 U.S. 370, 384 (1990) (explaining that arguments of counsel "are usually billed in advance to the jury as matters of argument, not evidence, . . . and are likely viewed as the statements of advocates" while instructions from the court "are viewed as definitive and binding statements of law").

[137] *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

the law was harmless was reasonable.[138]  Because the Nevada Supreme Court's determination constitutes an objectively reasonable application of clearly established federal law and was not based on an unreasonable application of the facts, Wesley is not entitled to federal habeas relief for ground 5.

## C.    Certificate of Appealability

The right to appeal from the district court's denial of a federal habeas petition requires a certificate of appealability.  To obtain that certificate, the petitioner must make a "substantial showing of the denial of a constitutional right."[139]  "Where a district court has rejected the constitutional claims on the merits," that showing "is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[140]  Applying these standards, I find that a certificate of appealability is unwarranted.

**Conclusion**[141]

IT IS THEREFORE ORDERED that the second-amended petition **[ECF No. 25] is DENIED**, and because reasonable jurists would not find this decision to deny the second-amended petition to be debatable or wrong, a **certificate of appealability is DENIED.**

. . .

---

[138] *See*, *e.g.*, *United States v. Mendoza*, 244 F.3d 1037, 1045 (9th Cir. 2001) (recognizing that "[a] slight misstatement of law by a prosecutor can be rendered harmless by the court's proper instruction to the jury").

[139] 28 U.S.C. § 2253(c).

[140] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077–79 (9th Cir. 2000).

[141] Wesley requests that I conduct an evidentiary hearing, ECF No. 25 at 27, but he fails to explain what evidence would be presented at an evidentiary hearing.  Plus, I have already determined that Wesley is not entitled to relief, and neither further factual development nor any evidence that may be proffered at an evidentiary hearing would affect my reasons for denying relief.  *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."); *see also* 28 U.S.C. § 2254(e)(2).  Wesley's request for an evidentiary hearing is denied.

1    The Clerk of Court is directed to:

2         •     SUBSTITUTE Brian Williams for Respondent Jerry Howell, and

3         •     ENTER JUDGMENT accordingly and CLOSE THIS CASE.

4    Dated: September 1, 2023

5    _____

6    U.S. District Judge Jennifer A. Dorsey